Court is now in session. Okay, gentlemen, welcome to this unfortunate zoom session of the court, but that's the only way we can process some of the cases at the moment. This is case number 230364, excuse me, O'Brien's Response Management v. BP. I will tell you, we have here to the same rules that we would if we were in New Orleans, which means no recording video or oral of this by you of this session. The tape will be available shortly after the argument, the official one would also admonish you all to be sure that your any cell phones or devices are muted, as are those of anyone in the room with you. And let's see, I guess that I guess that well, the usual ones we're familiar with the briefs and record excerpts, we may or may not have read the all of this voluminous record before we started the argument today. If you like, we will allow each side, five minutes of uninterrupted time. I see there are four lawyers. I'm sorry if this is coming as a surprise to you. But that's because of this the gaps in communication here. So if you want to do that, let me know. And with that, we'll call first Mr. Jones. Thank you, Your Honor, and I don't need five minutes uninterrupted. But I have about a minute of introductory remarks. May it please the court. I'm Stanton Jones from Arnold and Porter and I represent BP. Today, I will address the insurance issues with respect to navigators. And then my co counsel, Mr. Hicks will address the indemnification issues with respect to O'Brien's and NRC runners as part of a deal where BP paid billions of dollars for 1000s of workers to go do dangerous work. O'Brien's agreed to purchase CGL insurance for itself, and to name BP as an additional insured on quote, all policies. Under this arrangement, BP could rely on O'Brien's judgment about how much CGL insurance was appropriate. And O'Brien's and its insurers in turn would shoulder the risk of claims later brought by O'Brien's workers against BP. And sure enough, O'Brien's purchased hundreds of millions of dollars in CGL insurance. But the district court agreed with navigators the insurer that O'Brien's was only contractually obligated to add BP on a measly $2 million in CGL coverage. And the district court does acknowledge what what BP asked for $2 million worth of coverage. So in section 12.01 of the contract, O'Brien's agreed to purchase CGL insurance with minimum limits of $2 million. But then in section 12.02, Your Honor, and this is the critical text of the contract, it specifies that O'Brien's is additional insured on all policies and the words all policies is it's expansive language. The Texas Supreme Court has said that the word all all means all that the word couldn't be any clearer. It is an all encompassing word and all policies clearly refers back everyone agrees that it refers back to the types of insurance that are listed in section 12.01 excluding workers comp. So that includes CGL insurance and section 12.02. The reference to all policies, it contains no words of limitation, no qualification. There's no mention there of any minimum required coverage language coverage limit. Mr. Jones, your your argument is based on the contract, which I'm looking at right now. But you have to overcome it seems to me the holding of the Texas Supreme Court and in Ray, Deepwater Horizon, I think, and the Ironshore case, and both of those say you look first at the policy. And the policy says, another insured, right? Name another insured. Does the policy include the terms of the contract? Or not? Yes. And there's actually no dispute about that, Your Honor, everyone agrees that the insurance policy defines the assured to include both O'Brien's as the named insured, plus anyone else that O'Brien's to whom O'Brien's was obligated to name as an additional insured under a written contract. And that is the O'Brien's contract. And the policy does not limit to the coverage to the extent limited by the contract, right? That is correct. Certainly, our position is that the relevant obligation, the relevant requirement under the contract was to name BP as a full additional insured on all policies providing CGL insurance, but you're correct. Well, I'm just wondering why you didn't rest more on the Forest Oil case from the Fifth Circuit. You're familiar with that? I am. Forest Oil, I agree, supports our position, as does the Musgrove case, which is the first in this sort of line of It was a similar situation in terms of the insurance policy referencing the contract, but the contract did not contain an all policies requirement. There was similar language, it said all insurance coverages in a separate contractors manual. But that manual said that the contract would prevail over the manual in the event of a conflict. And that's what this court relied on. That decision, the Musgrove decision, which again, the first in this line, strongly suggests that if the all policies language is in the contract, as it is here, it means what it says, and it requires that the party is an additional insured on on all policies, not only the policies necessary to add up to the minimum required coverage. That is the meaning of the plain text, all policies. It's also supported by the meaning of the word minimum, which is just that it's a minimum, it's not a maximum amount that was required for O'Brien's to buy. And what do you say about Ironshore? In Ironshore, Your Honor, the contract did not have the all important all policies language, there was no language in the Ironshore contract, anything like that. And in Ironshore, on the everyone agreed in Ironshore, that the company basic was only required to purchase exactly $5 million in coverage for the other party endeavor that was undisputed. The only question in Ironshore, the only dispute was whether the insurance policy incorporated that $5 million limitation from the contract. And that's simply not an issue here. So Ironshore really adds nothing. All of the cases, Musgrove, Ironshore, Forrest from this court, they either support BP's position, or they simply don't speak to the issue here. There is one other case that we cited that is directly on point. That's the APAC Southeast case from the Georgia Court of Appeals, a case involved both insurance policy language and contract language that's almost word for word identical to everything here. And the Georgia Court of Appeals in a thorough unanimous opinion, agree adopted BP's exact interpretation of that language. The structure of the O'Brien's contract reinforces this reading of all policies. In section 11.07, which immediately proceeds sections 12.01 and 12.02 on the same page of the original O'Brien's contract 11.07, the parties referred to quote, required insurance coverage. And in context, that's referring to the minimum coverage that was required of O'Brien's to purchase for itself, that that language required insurance coverage is right next to the words all policies in the contract. And the fact that the parties use different language means that those that all policies has a different meaning. It doesn't just mean required insurance coverage. And that makes sense. In the commercial context, if you just think about this from the perspective of economic reality, in a context where BP was hiring O'Brien's to send 1000s of workers to go do dangerous cleanup work, it makes no sense that BP would require O'Brien's to purchase CGL insurance for O'Brien's and BP, but then allow O'Brien's to buy hundreds of millions in insurance for itself, but only $2 million, which is essentially nothing for BP. That's just that's commercially unreasonable. And it's not. It's not correct. BP has done a lot of things in this overarching litigation that one might say are not commercially reasonable. That's that's really unnecessary, but I do not see the analogy between 1107 and 12. Article 12. For one thing, 1107 requires just to support the indemnity obligations. And it requires qualified self insurance with minimum limits, not less than $5 million. I don't see anything else in 1107. Number one, number two, isn't it true that this language of paragraphs 11 and 12 is basically identical to the language that was in the master service contract back in 2004. So I'll take those in turn. Let me explain 11.07. First, here's the here's the argument. Navigators interprets the word all policies in 12.02 to mean only the required minimum coverage only the required insurance coverage. But 11.07 shows that when the parties wanted to refer only to the required insurance coverage, they knew how to do that because 11.07 uses the exact words required insurance coverage to refer to the $2 million minimum that O'Brien's was obligated to buy for itself. 12.02 uses different words, it uses the words all policies. And that word is expansive and different than simply required insurance coverage. In terms of your second question, the two paragraphs 12.01 and 12.02 were in the original contract and were not changed in 2010. When the contract was amended after the spill, but that supports our reading, because our reading makes sense in that context. It's true that in 2010, O'Brien's was taking on a much larger and more dangerous scope of work. But there was no reason for the parties to amend the contract because BP had essentially already hitched its its coverage. Your honors, I see that I'm about out of time, if I could just take 30 seconds to talk about our second argument. Even under the district courts. Oh, go ahead. Okay. Thank you, Your Honor. Um, even under the district courts erroneous view that O'Brien's was only obligated to add BP on $2 million of CGL coverage, the star and cops policies don't satisfy that obligation because the cops policy is not CGL coverage at all. CGL is a very well understood type of insurance coverage. It's like a pie with a slice cut out. The pie is losses from bodily injury and property damage. And the slice that's always cut out of CGL policies is professional liability and pollution coverage. The star policy is a CGL policy. It's the pie with the slice cut out. The cops policy is not a CGL policy. It's the slice that gets cut out of a CGL policy. The cops policy provides coverage for pollution and professional liability. That's not CGL coverage. So O'Brien navigators has basically said, you can have one whole pie, which is the star policy, the pie with a slice cut out and then the cops policy, which is the missing slice. And they've said that they're giving us two pies. But in fact, it's only one pie. So in either event, the navigators policy is necessary to achieve the minimum required coverage. Whatever that is. In our in our view, Your Honor, and the Georgia Court of Appeals decision is directly on point. It's it's all policies all means all. I understand. All right. Um, we'll hear next from Mr. Hicks. Thank you, Your Honor. And may it please the court George Hicks for the BP appellants. I'll be addressing the indemnification issue involving O'Brien's and NRC. During my brief time before you, I'd like to highlight three important points underscoring why the district court wrongly held that BP cannot obtain indemnification for any of the claims at issue. First, as to opt out B3 claims, it is undisputed that a number of opt out B3 plaintiffs did not provide until very recently, the employer information necessary for BP to tender those claims to O'Brien's. The district court agreed that this lack of information would prevent the tendering of claims. But it then identified a supposed cure, the so called databases that O'Brien's does not even mention on appeal. The fact that O'Brien's does not even defend the district court's reasoning powerfully demonstrates that the district court erred in holding that BP cannot obtain indemnification for any of the opt out B3 claims. Second, let me ask you a question about that list. Um, could O'Brien's have identified its own employees if BP had notified them of the list of claims of all the B3 opt outs? Did they have figured it out? A couple of responses, Judge Clement. First, I don't think that they could have because it's not just an issue of did they work for O'Brien's directly. There were sub contractors and sub subcontractors. And it wasn't even I don't even know if it was necessarily possible for O'Brien's to be able to track down. But I also think the more important point is that that's not simply not what the indemnification contract required, I think, because I think this is now O'Brien's new argument, since they're running away from the district court's reasoning on the databases, which is that, well, it doesn't matter. Because as long as they could have just sent the the the 1600 claims to all 80 of its contractors, that would somehow suffice as, as proper notice. But if the contract actually says, BP or the company shall probably give to the other party notice in writing of any claim made or proceedings commenced, for which BP seeks indemnification under this contract. And I think if you look at the phrases to the other party, and under this contract, I think it contemplates that BP would actually know that O'Brien's is the employer to which it had to tender these. And at the time, I mean, if you look at record 6690 to 6704, or record 7993 to 8028, these are a number of examples that we cited in our brief, if you look at these short form jointers that were filed by the opt out B3 plaintiffs originally, there is no employer information whatsoever. I mean, really, these are just sort of form letter jointers. And so there's nothing that BP could have used in any shape or form in 2012. To have any idea of to whom these opt out B3 claims should go and the idea that they should have to notify all 80 or so of its contractors, and then maybe their subcontractors and sub contractors, it means some of these sub subcontractors, you know, literally a guy with a boat is simply not something that's required by the contract. And it's not really consistent with the timing elements under Texas law of what is prompt notice. And so I think surely, O'Brien's could have identified their employees, if they had the list. I don't know if that's true. I mean, there were hundreds of O'Brien's employees, but I don't I simply don't think that that was BP's obligation under the contract, that it had to sort of submit 1600 claims to all of its contractors. I mean, O'Brien's was one of 80 contractors. I'm very confused about numbers that are thrown around about cases. One of the briefs said, I think yours. Excuse me, that there were 426 opt outs for O'Brien's and 24 for NRC. Now, admit, I mean, you know that those are O'Brien's employees. Is that right or not right? We only know that as of 2019, your honor, because that's when the PTO 66 process finished, and we finally had employer information, all of those individuals, those opt out B3 plaintiffs, those are the individuals who back in 2012, which is what the district court was focusing on. They didn't provide any employer information. We did not know any of that. We know now that there's 425, but we didn't know that in 2012. Is 425 the the ultimate number or it's just going to grow? Well, there are other contractors, you know, where there are, I mean, I believe there's, you know, something in I think we're around 800 to 900 opt out B3 claims that are still out there. And of course, some of those, there are 80 other contractors. Now, as far as tendering to O'Brien's, I don't believe that's going to get any bigger, because the PTO 66 process that wrapped up in 2019, has provided the employer information for these opt out B3 plaintiffs. And immediately afterward is when BP tendered the claims once it had the information. Well, we're going to have more time and I just have one other question. Why are you spending all your time, Mr. Hicks on the subject that is at present 450 claims as opposed to that which is 2500 claims, which is what you suggest to the below or bellow group? Well, Your Honor, I if I had more time, I mean that that was my second point, I was hoping to make three points at the outset and and I we sort of got off into the the opt out B3 claims. But, you know, absolutely, I agree that that the below claims, there's also been no breach of the indemnification contract. And even if there had been, there was no material breach, certainly not as to each of those below claims. And I'm, you know, I would be happy to talk about that if I had more time, and maybe on rebuttal, I'll get a chance to but that that was my second point that I wanted to make. And the very last point was simply, simply just the fact that that simply because BP may not have been entitled to judgment on the pleadings, that it could obtain indemnification for all of the disputed claims does not necessarily mean that O'Brien's and NRC are entitled to judgment on the pleadings that they need not indemnify BP for any of the claims. And that's what the district court held. So at a minimum, we think that there needs to be a vacator and remand to determine which claims trigger the indemnification obligation and which do not. If there's no further questions, I'll save my time for rebuttal. Okay, thank you. Mr. Maloz. Hey, police, the board, Wilson Maloz, counsel for Appalachian Navigators Insurance Company. I'll be discussing only the remaining issues. I appreciate the court's accommodation and offer for no interruptions for five minutes, but I would prefer to address any questions that the court may have as soon as the court has them. BP is arguing that is somehow entitled to additional assured status and coverage for 175 times the amount that O'Brien's was required to provide in the applicable contract. It's fantastical, it's implausible, and it is the most unlikely of scenarios. That's how the district court in the Ironshore case, which governs this matter, described the exact same interpretations that BP is offering for the contract and the insurance policy in this case. This court, the Fifth Circuit, affirmed that district court's opinion in its Ironshore opinion, and under the insurance policy interpretation, held that the same interpretations that BP is now offering were simply not reasonable, or to use another word from applicable interpretation law, absurd. And remember, BP has the burden of proof to show that it is an additional assured on the navigators policies. My argument is going to concentrate primarily on the Ironshore decision and a brief history of the cases that led up to that decision, some of which Judge Jones already brought up with Musgrove and Forest Oil. I will also explain why the COPS policy and the STAR-CGL policy actually met the $2 million minimum insurance requirement, which was all that was required by the O'Brien's contract. And these will both establish why the ruling of the district court should be affirmed. Ironshore was decided in 2015. But it's not an outlier. It's not an anomaly. It rests on three decades of precedent from this circuit that began with Musgrove in 1990. And Musgrove was a Louisiana law case that this court decided. It eventually, and Forest Oil brought the same line in for Texas law. But in Musgrove, there were two additional assured provisions. And I noticed when Mr. Jones was speaking for BP, only the second additional assured provision was discussed. That actually did not apply at all. And any discussion of that provision in Musgrove was dicta. The additional assured provision in Musgrove that did apply had the exact same factual scenario that we have in our case. A million dollars minimum primary required an excess policy that only attached it at above a million dollars, and a contract that required only the million dollars minimum. And in that situation, this court held that there was no additional assured coverage on the excess policy. That's exactly what we have here, a $2 million requirement, primary policies cover it, no attachment on the navigators policy. Now the other the other provision that didn't apply is different. It had even if we want to look to that, but we don't have to, but we can. It had wording that is not in the O'Brien's contract. This was additional assured status on all insurance carried whether or not required by the contract into the full amount of such coverage, not the minimum. Those are words that BP wishes were in the O'Brien's contract, but they're not in there. And so that additional assured provision that didn't apply in Musgrove also doesn't apply here. But what about forest oil? Forest oil, there were two policies and one of those policies called the non operator, an additional insured or whatever the contract says, and the other ones are as named by the parties and the other one said, but the obligation is limited by what that contract says. That language is not present in navigators policy. I'm very happy you brought that up, Your Honor, because the two additional short provisions and two policies in forest oil actually support navigators position. There was a primary policy that unlike the navigators policy did not limit the additional assured coverage to the contractually required amount. In that situation, the forest oil court correctly held that the additional assured coverage was not limited by the contract minimum. The other policy, the excess policy says, is it not? No, Your Honor, my policy matches the excess policy in forest oil in which and this is crucial. The policy did limit additional assured coverage to the amount required by the contract. But I thought the other one did in forest as well. No, Your Honor, one amount required by the contract. Okay, you can make your argument. I won't interrupt. Yes, Your Honor. But I'm happy to hear your question if you have. No, that's all right. The first policy in forest oil, the additional assured scope was the full policy limit. The excess policy in forest oil, with language nearly identical to the navigators policy, did limit the scope of additional assured coverage to the amount required by the contract. I'm looking at it now. The excess policy is obligated by virtue of a contract to provide insurance, but only to the extent of such obligations. Yes, Your Honor. That's a lot more precise and narrow than what your policy said. Let me address that two ways. One, my policy actually does have that language. There are two additional assured provisions in my policy. First one is the named and short one that says obligated as by written contract. The other is the supplemental additional assured provision, which does include language that limits the scope of coverage as required by written contract. I think this is crucial because we can avoid this discussion by going straight to NRA Deepwater Horizon, which says you only look at whether the words obligated, obliged, or required are used in the contract. If you look at the governing later Texas Supreme Court decision of NRA Deepwater Horizon, it holds that the scope is limited solely by the use of the word obligated, or obliged, or required, regardless of whether or not something like that additional language. Well, let me ask you about that. I'm not going to tell you I'm an overnight expert on Deepwater or Irontor. I thought the issue in Deepwater was the language of the policy versus the language of the party's contract. And therefore, I'm positing you can tell me in Deepwater, they weren't talking about obligation limited to the whatever I read you in Forest Oil because otherwise, it seems to me you're saying Forest Oil is at least partly overruled. I wouldn't say it's overruled. I would say it's clarified. And to address what you said, Your Honor is absolutely correct. The additional assured issues in NRA Deepwater Horizon were not the minimum limits requirement like the ones before this court. So we look to Deepwater Horizon, not for the facts and the which clearly states from the Texas Supreme Court, if the additional assured scope in the policy is limited to as obligated as obliged or required, then those contract limits are then read into the policy. Ironshore then comes along three or four months after NRA Deepwater Horizon takes that law that was announced in NRA Deepwater Horizon and does apply to the exact issue that is currently before this court, whether a minimum... I don't really see it as the exact issue. Number one, it doesn't have this language, all policies. And number two, in Ironshore, there was not just minimum, but there was a stipulated excess sum. So that together, the only way you can look at that, it seems to me is stipulated total coverage, 5 million. And that 5 million, whether it was brought up by the one plus the four, or a five total, was still the contractually limited amount, which the court held that the obligated words in the insurance policy read in as a limit to the additional assured coverage, regardless of what the limit of the policy actually was. Where do you quote your policy language in your brief? Do you recall? I don't recall off the top of my head, but I can certainly find it. It is... There's a lot about O'Brien's... Yes, Your Honor. Some of it is on page 14 in our summary of the report. Was it attached as an exhibit to your complaint or... It was, Your Honor. It is part of the record on appeal. And the language that we would look to is on page 30 and 31. Okay. All right. That's all I need. Okay. Thank you. And I appear to be out of time. I did have some more arguments, but unless the court has any more questions, I'll conclude. Well, I don't think my colleagues do. So let's turn it over to Mr. Schaffer. Thank you, Judge Jones. May it please the court. For O'Brien's and NRC, Your Honors, we take no position on BP's first issue. So I'll be limiting myself to the second, the question of indemnification. And let me start where Mr. Hicks began with the B3 opt-outs. And let me please start, if I may, with your question, Judge Jones, about the numbers here. Because I think Mr. Hicks misspoke or I misheard him. I understood him to be saying that for the 400-plus claims as B3 opt-out claims as to which O'Brien's has been put on the hook for indemnification by BP, they didn't know as to any of them, as to any of them, that O'Brien's was the employer. And that's just not true. And BP could not have submitted that consistent with Rule 11 and what Judge Barbier knew about the short-form joiners and the information that's long been available to everyone. What BP did allege is that for a dozen illustrative short-form joiners, for that dozen, they were missing the employer information. That's the extent of BP's submission to the district court. And let me just emphasize, all of Your Honors, that we're talking about more than 1,600 B3 opt-out claims, all of which were filed before the end of 2012. All of them filed, there's no question as a to BP. And BP didn't seek indemnification as to any of them, not as to any of them until 2019. So we're talking about a seven-year lag as to which there was no notice and no claim for indemnification by BP going to O'Brien's or going to NRC. Now, of course, Judge Clement, of course, if O'Brien's had been asked by BP, are these your employees? We could have answered that question. Of course, if BP had provided notice to all the potential indemnitors, it would have had an argument that they were doing what they could. If BP was even before Your Honors, I'm sorry, Judge Jones. When you get this number 1,600, is that the total number of opt-outs or the total number of O'Brien's opt-outs or what? The former Judge Jones, the total number of B3 opt-outs that there's no contention by BP that they did anything, that they... Well, part of, you know, this whole thing has been managed from on high by the district court from day one. And I do not see how it can...I do not see how they can say, we didn't know who these employees were. And you can say, oh, we know who exactly who they were. That at least is a fact question in my mind. I do not understand. Judge Jones, perhaps if it were a closed case, you might concern yourself with that. But this is... How do we have any basis for knowing that Judge Barbier knew that you were correct as to the pleadings, to the extent that they are incorrect as to everything? Well, to your point, Judge Jones, that no one on this court is going to become an overnight expert in this litigation. Judge Barbier is that, obviously. That's why he at the NBL before me... He's an expert manager. But it defies belief to say that he or his staff had gone through 16, if you say it's 1600 claims, or 400 claims or whatever, in order to say you're entitled to judgment on the pleadings. Judge Jones, to your point, I'm not here contending that Judge Barbier would know definitively whether every single one of those claims had all the information on it. You know, I think we can accept... Isn't that the problem? Isn't that precisely the problem about granting a 12C? It shouldn't be from BP's perspective, Judge Jones, because BP specifically argued against us that there should be no discovery. Instead, there should just be judgment on the pleadings. And Judge Jones, I understand your point that, you know, litigants can do that and say, maybe I win on the pleadings, but if not, we move on to discovery. I would urge respectfully, read BP's submissions to Judge Barbier. Their submission was the whole case could and should be resolved on the pleadings up or down. I understand that. They wanted that. Okay, fine. But life doesn't... the judge doesn't always do what you want him to do. And you're entitled to adjust your position. Fair enough. But I also think the district court judge is entitled not to be sandbagged. And there was no submission to Judge Barbier that this would be fact sensitive, and that there might be a different outcome as to some B3 opt-out claims as considered... My point stands that from what that we know, from the only thing that is in this record, we have a conflict of fact as to whether all of these be all of the employer information in these B3 opt-outs was known or knowable to BP to be that of O'Brien's or its subcontractors because the indemnity runs to the subcontractors claims as well. And as to O'Brien's, which I'm here for, I'm just submitting to your honor, I do not think... You would be obliged to indemnify any of your subcontractors, would you not? I don't know those indemnification provisions, honestly, Judge Jones, and I don't believe there's any such intention. We're both parties are indemnifying the other over all of the people they had control over. But the agreement is specific to BP. That's the only one that's in the record. That's the only one that Judge Barbier was speaking to. And as to that, I would just note, Judge Jones, BP has not made an argument that we couldn't match employee names to our own databases and to our own information or that BPs couldn't do that or Judge Jones, that they couldn't ask the plaintiff's counsel, hey, we're missing some information from the short-form joiners. Can you better equip us and the would-be indemnitors? None of that. Who are the plaintiff's counsel here? It was class counsel. And there's a steering committee of them. I don't have their names on my fingertips. Are these the same class counsel that are responsible for all of the property damage claims and everything else? I think that there are lines of distinction between the class counsel, but I honestly can't be able to talk about the opt-out ones, but there is a steering committee, Judge Jones, and there's no allegation by BP. Speaking of steering committees, you were on a steering committee. Absolutely. And we never received... What steering committee was that? It was a defense steering committee, and it was there in place at the time of the medical settlement agreement. There was no indication to us or anyone on that steering committee that we should be performing these sorts of investigations and that's subject to the additional information we might be on the hook for indemnification. Excuse me. So you weren't on the email list, getting notice of everything that went to the defendant's steering committee? All I meant, Judge Jones, is there was no notification to us from BP that BP was taking the position that we would be on the hook for indemnification as to our employees. Had we received that notification, we would have investigated. We would have asked for a seat at the table. You couldn't investigate. Excuse me. You couldn't investigate because the judge wasn't allowing any discovery. He had the short form statement, then he had the longer form statement, then he had, now I will allow you to do interrogatories. He had this carefully sequenced management plan. And BP, I assume, is abiding by that the same as you would have. Judge Jones, two points. Even without any. Well, I think in relevant part, it is. We didn't have any say as to whether Judge Barbier should be maintaining that stay on discovery because we didn't have anything to say about the B3 opt out claims that weren't filed against us. You were on the steering committee. But Judge Jones, respectfully, we had nothing to say on the steering committee about B3 opt out claims that were not against O'Brien's and BP had not indicated we would have status as an indemnifier. And but here's the other point. Even without discovery, we could have checked our databases and asked our employees who were on the short form joiners. Where were you? When were you there? What records do we have around that? We could have done our own independent investigation. Instead, we had no notice whatsoever, even as to any one claim that indicated we should be defending these B3 opt out claims until 2019. That's nine years after the 2010 accident. And that's seven years after the deadline for all these claims to come in and close. So that's our case on prejudice. And that's our case that there wasn't compliance with the prompt notice requirement. Sorry, Judge Jones. No, go ahead. I'm sorry, Judge Jones. I missed you the last thing you said. I said, I'm sorry. Okay. Then for the below claims, let me tell you, Judge Jones, why it was that Mr. Hicks didn't go there. First of all, the B3 as to the below claims, there's just no question that there was a watershed settlement that governs them. It gives rise to them by terms and has important concessions from BP, including the fact that plaintiffs don't have to prove their exposure to certain contaminants. They're not subject to normal statute of limitations to normal affirmative defenses, including claim splitting and latches. And all that was agreed to by BP unilaterally. Again, without any notification to us on the steering committee or otherwise. And what is the terms of 11.04 say on this? Neither party shall affect settlement or compromise of any claim or proceeding without having obtained the prior written consent of the other party. It's clear. And the violation of it was fragrant. We'd respectfully cite your honors to the Sedico case for the proposition that section 11.2 specifying that subject to the requirements of section 11. That's what the indemnification obligation is predicated upon. It's very clear as a matter of law. Well, let me ask you why, why would O'Brien's be bound by that if you didn't participate? Because it's, it's all through BP judge Jones. So there's no question, I think, that the B that the medical settlement is binding, not litigated, though. But I think those plaintiffs made an agreement with BP because you're subrogated. Is that the point? That's right. Judge Jones, no one's here to blow up medical settlement, which continues to bind both sides. Let me argue to say, well, let me ask you one final question about that. And that is, is it accurate for us to take the VLO claims as a standalone benefit or burden on O'Brien's cross-indemnity obligation? Because BP never sought indemnity on most of the claims, which were apparently thousands in number, which it did settle under the medical settlement. And if it never sought indemnity, isn't O'Brien's benefited to that extent? I don't think so, judge. Obviously, had we had a seat at the table, had we had to say, as we were contractually entitled to, we might have struck a fundamentally different balance and said, we want to have a contained liability here and a contained payout. Instead, BP left it totally open-ended, no time limit. I know that, but you're not answering my question. Why should we, in analyzing whether there was a material breach, not consider the fact that BP didn't even call on O'Brien's or NRC to indemnify it for the vast majority of these claims? Because that's not how the contract works, and we don't know of any authority. And that means it's a claim by claim contract, doesn't it? I don't think so, with all due respect, Judge Jones, because it says no claim, no settlement or compromise as to any claim or proceeding. And that's unqualified language. And we certainly had a proceeding that was settled. Plural in your view, and claim is singular. Yes, in the class action context, of course, this is so important in terms of, to take BP's language, commercial reality, economic reality, that's exactly when you, as a would-be indemnitor, want to be present and able to have say, and we didn't. And this court has held that that's prejudiced as a matter of law. That's the Motiva case that I'd cite to your honors. If I could make one more point, Judge Jones. You know, I know I've not prejudged this case. I want you to know, but I do think that because of these circumstances where we have a district judge who is managing basically zillions of claims in what he believes to be a very organized fashion, when that management deeply impact the way in which contractual provisions are to be interpreted, I just think we have to look at the whole circumstance. And if I may make one point directly responsive to that, Judge Jones. I think for exactly that reason, you should be very leery of BP's invitation that you're gonna have fact-bound, claim-by-claim determinations across this ocean of litigation. When you have contractual provisions that are as clear as what you have in the O'Brien's agreement and violations that are as flagrant as BP was for, plus settled law from the circuit that says these are conditions precedent that BP clearly did not comply with, with almost vanishingly rare exceptions, even according to their contentions now, which are not contentions that they made to Judge Barbier. And last on NRC, I wanna make that point. Your honors, now Mr. Hicks is here telling you that the declaratory judgment that was granted in favor of NRC was too broad. There was no such argument or suggestion forthcoming below. BP claimed they were entitled to indemnification as to NRC. We said that they were not. It was up or down, posed that way to Judge Barbier. And once he concluded that there was no serious allegation that any of the claims met the various stringent requirements for NRC to owe indemnification, he decided this case the only way it could go, declaratory judgment in our favor of no indemnification for NRC. It really is that easy. We respectfully submit on the NRC side of it. I know my time has elapsed. Thank you, Judge Jones. Thank you, your honors. All right, Mr. Jones, rebuttal. You're muted, you're muted, you are muted. Yep. Sorry, can you hear me now? Yes. Great, sorry about that. Okay, a few points on the insurance issue. Starting with what you did not hear from Mr. Malaz, you heard almost no discussion of the actual text, the language in the O'Brien's contract and the Navigator's insurance policies that are at issue in this appeal. Navigator's entire argument here rests on a bunch of cases that involved really substantially materially different language. And I'll just discuss, try to hit the main points from each of them. The Ironshore case. The contract there did not have anything like the all policies provision here. It also didn't require a minimum amount of coverage for the additional insured. It required an exact amount of coverage. Everyone agreed with what the contract there required in terms of additional insured coverage. So the fight that we're having here was an agreed point in Ironshore. Musgrove, that case strongly supports BP. It suggests that if the contract itself, includes all policies language, like the O'Brien's contract here, then that means all policies not limited to the minimum required coverage limits. The Forest Oil case. The Forest Oil case like Ironshore didn't have any all policies language. So it just doesn't have a contract provision even remotely resembling the one that we're fighting about in this appeal. In addition, as Judge Jones's questions indicated, the excess policy at issue in Forest Oil included limiting language that does not appear in the navigators policies here. And I wanna be very clear, the definition of assured, which goes to both O'Brien's and the additional insured is on page 6099, 6,099 of the record. It's definition 1B. I believe Mr. Malazzo was referring to a different provision, a special condition somewhere else in the insurance policy. That is not the definition of assured. It relates to further additional insured that's not at issue here. In the in Reedy Deepwater case, Judge Jones's questions suggested that correctly, that the question there was whether the insurance policies incorporated limits on coverage that were explicitly stated in the contract. That's not the dispute here. Your honors, the text, the actual language of the insurance policies and the contract here overwhelmingly favors BP, but at a bare minimum, our reading of the contract and the policies is at least reasonable, especially when the only decision that's on point, the AIPAC Southeast case adopts our exact reading and under this court's controlling precedent in ALBRIS resources, if our reading is at least reasonable, BP prevails in this appeal. Unless there are any questions, I'll turn it over to Mr. Hicks. Okay, Mr. Hicks. Thank you, your honor. Just a few points in rebuttal. Starting with the opt out B3 claims, again, there were 1600 of these claims. Mr. Schaefer's contention that all of the information was available in the short form joinders is simply rebutted by the at least dozen examples that we provide where the employer information simply is not there. And to be clear, those are examples. They are not the entire universe. And just by themselves, they defeat judgment on the pleadings, but by sort of our own back of the envelope estimate, many of the claims have that same failing. We cited a dozen, but either way- So why did you tell the district court or advise the district court that the case ought to be decided up or down in your favor? Well, we do think it can because one of our other arguments is that the district court's own process by not completing the getting the claims into shape until the end of PTO 68, meant that as a matter of law, none of these claims were in any shape to be tendered until 2019. But if you don't accept that and you simply look at the employer information, that defeats judgment on the pleadings for O'Brien's because at least a dozen, and in reality, many more claims lacked that information until the end of PTO 68. And it is a factual question, just as Judge Jones, you're correct. The question that both I and Mr. Schaefer tried to answer in response to Judge Clement's question about could O'Brien's have identified... The honest answer based on judgment on the pleadings is I don't have that information. Mr. Schaefer doesn't have that information. That is a factual question that is appropriate for discovery. And then my last point that I wanna make two points is of course they had noticed about the settlement. They were on the defendant's steering committee. They knew about the settlement. They knew about the below claims. They knew about BP's preservation of its indemnity right, but they never objected as many other parties did. The last point as to prejudice and materiality, it is a claim by claim analysis. And this idea that subject to creates a condition precedent. As we point out, the Texas Supreme Court has both before and after the Sadie Coe case in Foreca and Gulf Energy refuted that. And they have said that subject to does not as a matter of law create a condition precedent. Mr. Hicks, when you say that other defendants had objected to the settlement, did any of them object concerning indemnification duties? Your Honor, I don't know the answer to that standing here today. I know that the settlement was heavily litigated for several months and it was by no means done in a smoke-filled room. And certainly people on the defendant's steering committee knew everything and anything about that settlement. If there are no further questions, thank you very much. Okay, thank you gentlemen. Thank you, Your Honor. We'll be in recess until 9 a.m.